E-FILED
Monday, 14 June, 2021  10:02:58 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS, URBANA DIVISION

| | | |
|---|---|---|
| **JANICE COLLINS,** individually, | ) ) ) | |
| **Plaintiff,** | ) ) | |
| -v- | ) ) | **Case No. _____** |
| **THE BOARD OF TRUSTEES** **OF THE UNIVERSITY OF ILLINOIS** an Illinois public entity, and **KENNETH ERDEY,** individually, | ) ) ) ) ) ) | **JURY TRIAL DEMANDED** **EQUITABLE RELIEF IS SOUGHT** |
| **Defendants.** | ) | |

### PLAINTIFF'S COMPLAINT AT LAW

NOW COMES Plaintiff, JANICE COLLINS, by and through her attorney, Thomas G. Gardiner of Gardiner Koch Weisberg & Wrona, and for her Complaint against Defendants, THE BOARD OF TRUSTEES OF THE UNIVERSITY OF ILLINOIS and KENNETH ERDEY, and in support thereof, alleges as follows:

1.      This is a civil action for employment discrimination pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000, *et seq*., (hereinafter "Title VII") and the Illinois Civil Rights Act of 2003, 740 ILCS 23/5 (hereinafter the "Illinois Civil Rights Act"), for discrimination based upon race, sex, harassment, and retaliation.

2.      Plaintiff also brings Counts against Defendant Kenneth Erdey for Intentional Infliction of Emotional Distress and Negligent Infliction of Emotional Distress.

1

## I.     THE PARTIES

3.     Plaintiff, Janice Collins (hereinafter "Plaintiff"), is a resident of the State of Illinois.  In or around 2012 and until in or around 2019, Plaintiff was a tenure track appointed Assistant Professor in the Department of Journalism of the College of Media (hereinafter "Department of Journalism") at the University of Illinois at Urbana-Champaign (hereinafter "UIUC").

4.     Defendant, Board of Trustees of the University of Illinois (hereinafter "Defendant Board of Trustees"), is an Illinois Corporation commonly known as the University of Illinois with its principal place of business located at 352 Henry Administration Building, MC-350, 506 South Wright Street, Urbana, Illinois 61801. Defendant Board of Trustees plays a role in the hiring and tenure track appointment process.

5.     Defendant, Kenneth Erdey (hereinafter "Defendant Erdey"), is a resident of the State of Illinois and a Technical Coordinator for UIUC Richmond Studio.  At all times relevant to this Complaint, Defendant Erdey was an employee of UIUC.

## II.    JURISDICTION AND VENUE

6.     Plaintiff incorporates by reference and re-alleges the allegations set forth in paragraphs 1 through 5, as if fully restated and re-written herein.

7.     Jurisdiction is proper under 28 U.S.C. § 1331, which provides federal courts jurisdiction over all claims arising out of the Constitution, treaties, and laws of the United States.

8.      Jurisdiction over the Plaintiff's state law claims is proper under 28 U.S.C § 1367, as the state law claims arise out of the same set of facts and circumstances as Plaintiff's federal law claims.

9.      This Court has subject matter jurisdiction over all of the parties because at all times relevant to this Complaint, Plaintiff is a resident of the State of Illinois, Defendant Board of Trustees regularly conducts business in the State of Illinois, and Defendant Erdey is a resident of the State of Illinois.

10.     Venue is proper under 28 U.S.C. § 1391(b)(1) as a substantial part of the events giving rise to Plaintiff's claims occurred in this District and Defendants are subject to personal jurisdiction in this Court because Defendants either conduct business or reside in this District.

11.     Filing in the Urbana Division is proper because the case arises out of facts and events occurring in Urbana.

### III.   FACTUAL ALLEGATIONS

12.     Plaintiff incorporates by reference and re-alleges the allegations set forth in paragraphs 1 through 11, as if fully restated and re-written herein.

13.     In or around 2012, when Plaintiff was recruited for the position of Assistant Professor of Broadcast Journalism by UIUC faculty members, Plaintiff was the first tenure track African-American female professor in the Department of Journalism at UIUC.

14.     Plaintiff was recruited because of her unique abilities, practical experience in all four (4) areas of Broadcast Journalism, teaching awards, as well as

3

expertise and innovative methods of teaching and pedagogy, including Active Centralized Empowerment (ACE). Her recruiters included the following persons: Rich Martin (hereinafter "Mr. Martin"), the Head of the Journalism Department; Jan Slater (hereinafter "Ms. Slater"), the Dean of the College of Media; Christopher Benson (hereinafter "Mr. Benson"), a senior faculty member; and Matt Ehrlich (hereinafter "Mr. Ehrlich"), a senior faculty member. The aforesaid persons, who are all Caucasian, represented that Plaintiff could focus on teaching, service, and creative endeavor.

15.     Throughout Plaintiff's employment at UIUC, Defendant Erdey regularly subjected Plaintiff to harassment and discrimination based on Plaintiff's sex as a woman and her race as an African-American.

16.     Defendant Board of Trustees, by and through its agents, managers, supervisors, and employees, ignored Plaintiff's numerous complaints of harassment and discrimination, and constructively discharged her for making such complaints.

17.     Such discriminatory actions of its agents led to Defendant Board of Trustees' denial of Plaintiff's application for indefinite tenure and declination to promote Plaintiff to the rank of Associate Professor.

18.     Defendant Board of Trustees made such decisions despite the fact that Plaintiff was one (1) of the most qualified applicants to the Department of Journalism, and for reasons unrelated to academic potential, skill, or quality of research.

19.     Instead, Defendant Board of Trustees' actions stemmed from impermissible and discriminatory reasons in violation of Title VII and the Illinois Civil Rights Act.

20.     At UIUC, more experienced colleagues typically assist applicants in the process for obtaining tenure.  In Plaintiff's case, for most of her tenure process, Nancy Benson (hereinafter "Ms. Benson"), the Interim Head of the Department of Journalism, and Tracy Sulkin (hereinafter "Ms. Sulkin"), the Dean of the College of Media, failed to support Plaintiff properly in the tenure process and did not present her work in an appropriate manner.  Ms. Benson and Ms. Sulkin are Caucasian females.

21.     Defendants' discriminatory actions, including negative employment references, were in retaliation for Plaintiff's assertion of racial and sex discrimination in violation of Title VII and the Illinois Civil Rights Act.

A.      **The Harassment Experienced by Plaintiff**

22.     In the spring of 2013, Plaintiff began working at UIUC as an Assistant Professor of Broadcast Journalism in the Department of Journalism with her tenure to begin in August 2013.

23.     Almost immediately after she was hired by UIUC, Plaintiff began to suffer repeated and extreme interruptions during her class lectures from her colleague, Defendant Erdey, who is a Caucasian male and is a technical coordinator and instructor for UIUC's Richmond Studio where various practicum courses are held.

24.     As a technical coordinator, Defendant Erdey was responsible for maintaining the broadcast equipment and assisting with technical issues in certain classes.

25.     Defendant Erdey handled equipment needs for broadcast courses in the UIUC Richmond Studios and had the responsibility of ensuring that the equipment functioned properly.  Plaintiff noted areas for improvement with some of the ways in which the equipment was handled and configured.  Defendant Erdey began to badmouth Plaintiff in faculty meetings.  Plaintiff raised those concerns to Mr. Martin and to Ms. Slater during the first semester in which she began working at UIUC.

26.     Defendant Erdey frequently sat in and interrupted Plaintiff's classes and told her students, both inside and outside of the classroom, that the way Plaintiff structured classwork and assignments was wrong and stupid.

27.     When Plaintiff asked Defendant Erdey to stop making said interruptions and comments, Defendant Erdey asked Plaintiff why she was always so angry and aggressive.

28.     Defendant Erdey often called Plaintiff stupid, dumb, intimidating, angry, and loud, as well as too aggressive in her teaching style.

29.     Such insults are rooted in historical racial stereotypes of the angry black woman and of black women lacking intelligence.

30.     Despite Defendant Erdey's discriminatory actions, Plaintiff continued teaching in the Department of Journalism at UIUC in the position of Assistant Professor of Broadcast Journalism.

31.     In or around March 2013, Plaintiff informed Mr. Martin, who was the Head of the Department of Journalism, that she was continually harassed and discriminated against by Defendant Erdey.  Mr. Martin is a Caucasian male.

32.     In or around March 2013, Plaintiff also informed Ms. Slater about the harassment and discrimination.  Ms. Slater is a Caucasian female.

33.     Ms. Slater attempted to connect Plaintiff to potential mentors to assist her in coping with the harassment and discrimination and building a tenure dossier, but she took no substantive actions to remedy the harassment and discrimination.

34.     Despite the harassment and discrimination, Plaintiff regularly appeared on the List of Excellent Teachers based upon student ratings.

35.     Throughout her employment at UIUC, Defendant Erdey frequently and purposefully unplugged, tampered with equipment, and moved equipment, thereby causing equipment to malfunction.  Plaintiff was forced to arrive at work early in order to reset the equipment and ensure that the equipment was working properly.

36.     In 2013, Mr. Martin transferred Plaintiff to another building, Gregory Hall, due to Defendant Erdey's continual harassment and discrimination that caused Plaintiff to experience repeated and extreme stress.

37.     Consequently, Plaintiff was reassigned to teaching multimedia classes instead of broadcast journalist classes for which she was recruited to teach, while Defendant Erdey was permitted to continue teaching broadcast journalism classes.

38.     Notably, Plaintiff had a higher-ranking position than Defendant Erdey, and she also had a more extensive background in broadcast journalism than Defendant Erdey.

39.     Despite Plaintiff's transfer to Gregory Hall, Defendant Erdey continually appeared in Plaintiff's classes where he criticized her teaching, harassed her, and discriminated against her.

40.     Defendant Erdey also sent Plaintiff racially charged, vulgar, disturbing, and inappropriate text messages, which made her feel deeply uncomfortable.

41.     Notwithstanding such harassment and discrimination, Plaintiff continued to teach and make progress toward her goal of achieving tenure.

42.     Plaintiff subsequently discovered that Defendant Erdey had spread false and malicious rumors about Plaintiff to fellow faculty members, including, but not limited to, Jean McDonald and John Paul.   Specifically, Defendant Erdey insinuated that Plaintiff was unqualified for her position and that he had been harassed by Plaintiff.

43.     Since Plaintiff had been transferred to Gregory Hall in order to limit her interactions with Defendant Erdey, Plaintiff lost opportunities to develop relationships with colleagues and to receive mentoring for her tenure dossier.

44.     Although she was hesitant, Plaintiff returned to the Broadcast Journalism building during the 2015-2016 academic year so that she could attempt to rebuild relationships with colleagues, better prepare her tenure dossier, and perform her job and teach classes for which she had been hired.

45. Despite knowledge of the history of harassment and discrimination by Defendant Erdey, Defendant Board of Trustees did not transfer Defendant Erdey to another building when Plaintiff returned to the Broadcast Journalism building.

46. As Plaintiff had feared, the harassment, discrimination, and interference with Plaintiff's classes by Defendant Erdey intensified.

47. Plaintiff continued to complain of the harassment and discrimination to Mr. Martin. As early as 2013, Mr. Martin informed Plaintiff that he told Defendant Erdey to stay out of Plaintiff's classroom without invitation.

48. In November 2015, Defendant Erdey explicitly told a student in Plaintiff's broadcast journalism class that Plaintiff's grading rubric and assignment instructions were stupid and wrong, and that he would have graded the assignment differently.

49. After said student informed Plaintiff of that conversation, Plaintiff sent an e-mail message to Defendant Erdey and copied Mr. Martin, expressing her frustration regarding Defendant Erdey's constant undermining and harassment.

50. In a subsequent e-mail message to Mr. Martin, Plaintiff indicated that Defendant Erdey had apologized and that she had accepted such apology. Plaintiff accepted the apology for fear of reprisal.

51. While Mr. Martin attempted to help Plaintiff, he never reprimanded Defendant Erdey, never placed Defendant Erdey on any type of probation, never called a meeting to address the issues, never wrote him up, never fired him, and never observed a single class to observe Defendant Erdey's inappropriate conduct.

52.     However, Defendant Erdey's apology was a hollow one, and he continued to harass and discriminate against Plaintiff.

53.     Plaintiff continually complained to Mr. Martin, Ms. Slater, and other administrators at UIUC until Mr. Martin retired after the 2015-2016 academic year.

54.     Mr. Martin was then replaced by Ms. Benson as Interim Head of the Department of Journalism.  Ms. Benson subsequently became the Head of Plaintiff's Department Promotion and Tenure Committee (hereinafter "P&T Committee").

55.     Meanwhile, Plaintiff experienced significant isolation in the Department of Journalism due to Defendant Erdey's negative remarks about her to other colleagues, including Mr. Martin and Ms. Slater.

56.     In the fall of 2014, Defendant Board of Trustees assigned Defendant Erdey to assist Plaintiff in the following courses:  Journalism 340, Journalism 440, and Journalism 445.

57.     Defendant Erdey told students that he was co-teaching all of Plaintiff's courses, even though he was not.  As a result, Plaintiff decided to include specific language in her syllabi stating that Defendant Erdey was not a co-teacher of her classes.

58.     Plaintiff continually complained to Ms. Benson and Ms. Slater that she was being harassed and discriminated against by Defendant Erdey.

59.     In 2017, after Ms. Slater's retirement, Ms. Sulkin was named the Dean of the College of Media.

60.     In 2018, Stephanie Craft (hereinafter "Ms. Craft") was named the Head of the Department of Journalism.

61.     Plaintiff became extremely frustrated and stressed with the continual harassment and discrimination, which manifested in physical, mental, and emotional symptoms.

62.     Therefore, Plaintiff decided to take a visiting faculty position at the University of Kansas in the spring of 2018.  Plaintiff explained the reasoning for her transfer to another university to Ms. Sulkin and Ms. Benson.

63.     As a result, Plaintiff missed a crucial time period on the UIUC campus for preparing her tenure dossier.

64.     On December 17, 2017, before leaving for the University of Kansas, Plaintiff reached out to Ms. Benson and Ms. Sulkin in order to address the persistent harassment and discrimination by Defendant Erdey.

65.     After Plaintiff returned from the University of Kansas, Ms. Benson, Ms. Craft, and Ms. Sulkin requested that Plaintiff meet with Defendant Erdey.  Plaintiff was deeply uncomfortable with the idea of a meeting with Defendant Erdey.

66.     Ms. Benson and Ms. Sulkin did not attend said meeting on June 4, 2018 despite Plaintiff's requests, as she did not want to meet with Defendant Erdey alone.

67.     Although Ms. Craft briefly attended said meeting on June 4, 2018, Ms. Craft left before any substantive conversations occurred even though Plaintiff pleaded with her not to leave.

68.     During said meeting, Defendant Erdey revealed to Plaintiff that he had been an abuse victim.

69.     After said meeting, Ms. Benson and Ms. Craft instructed Plaintiff and Defendant Erdey to write a report regarding how to resolve their differences because they would have to work together.

70.     Due to Defendant Board of Trustees' continual support of Defendant Erdey, Plaintiff reluctantly authored such a report with Defendant Erdey about said meeting and next steps because she did not want to be insubordinate or anger persons who would be involved in her tenure decision.

71.     Said report does not reference the race- or gender-based harassment and discrimination because Plaintiff feared raising issues related to such inappropriate conduct given Defendant Board of Trustees' persistent failure to address her concerns and complaints.

72.     Plaintiff, Ms. Benson, and Ms. Craft attended a follow-up meeting in which Ms. Craft apologized on behalf of the Department of Journalism for not intervening sooner.

73.     The harassment and discrimination by Defendant Erdey continued via text messaging, in Plaintiff's classes, and in hallway conversations.

74.     Due to Defendant Erdey's persistent harassment and discrimination, Plaintiff had no choice but to report his conduct to Ms. Sulkin and Ms. Craft despite her concerns that Defendant Board of Trustees might retaliate against her.

75.     Ms. Sulkin and Ms. Craft required Plaintiff to make weekly reports and consent to a mediation session with Defendant Erdey.

76.     After consulting with the UIUC Counseling Center, Plaintiff declined to consent to a mediation session with Defendant Erdey because the administrators consistently protected Defendant Erdey.

77.     In November 2018, Ms Sulkin recommended that Plaintiff's tenure request be denied.

78.     On December 6, 2018, Andreas Cangellaris, the Vice Chancellor for Academic Affairs and Provost and M.E. Van Valkenburg Professor in Electrical and Computer Engineering at UIUC (hereinafter "Provost Cangellaris"), informed Plaintiff that she would be issued a terminal contract for teaching during the 2019-2020 academic year.

79.     On August 2, 2019, Plaintiff attended a separate meeting with Ms. Sulkin and Ms. Craft in which Ms. Sulkin and Ms. Craft admitted that Plaintiff had dealt with a difficult situation with Defendant Erdey, and that she had been treated differently throughout her time at UIUC because she was an African-American female.

80.     Although Defendant Erdey was not assisting Plaintiff in the 2019-2020 academic year, Defendant Erdey continued to harass and discriminate against Plaintiff on a regular basis by sending racially charged and threatening text messages, intervening in her classes, and stopping her in the hallways.

81.     Plaintiff continued to report the harassment and discrimination to Ms. Craft and Ms. Sulkin, but Defendant Board of Trustees took no action except encouraged Plaintiff to attempt to resolve the situation with Defendant Erdey.

82.     Plaintiff has suffered and will continue to suffer severe detriments to her physical, mental, and emotional health due to the harassment and discrimination by Defendant Erdey.

83.      Said harassment and discrimination did not cease until the UIUC campus physically closed on or about March 16, 2020 due to the COVID-19 pandemic.

84.     The extreme harassment and discrimination by Defendant Erdey constituted a hostile work environment and caused Plaintiff to suffer repeated abuse.

85.     Defendants were well-aware that Plaintiff was in an especially vulnerable situation, and they knew that their inaction caused or was likely to cause severe emotional distress to Plaintiff.

**B.     The Tenure Process at UIUC**

86.     UIUC employs a standard procedure for determining whether to award a faculty member tenure.  The Provost's Communication No. 9 details the tenure process.

87.     At UIUC, faculty members' suitability for tenure is evaluated based upon their teaching and service, creative endeavor, and scholarly research.

88.     Newly appointed Assistant Professors are placed on a probationary period of six (6) years prior to any decision to grant tenure.

89.     The evaluation of a candidate's case for tenure is reviewed by the P&T Committees within the Department or unit, at the College level, and at the Campus level.

90.     Tenure track faculty members are assigned to the P&T Committee in their Department or unit.  The P&T Committee provides guidance and mentoring to tenure track faculty members and evaluates their teaching and service, creative endeavor, and scholarly research.

91.     The P&T Committee is comprised of persons in the professor's academic Department or home unit as well as persons outside of the Department and in the College, if needed.

92.     During their sixth year, tenure track faculty members submit work with their Department Head to prepare an evaluative dossier to determine if tenure will be awarded.

93.     The P&T Committee performs a third-year review in which a candidate for tenure submits a sample dossier for review and feedback pursuant to Provost's Communication No. 13.

94.     In providing the third-year review, the P&T Committee evaluates and describes both the strengths and weaknesses of the candidate's tenure dossier, and provides specific feedback regarding the expectations for the candidate moving forward.

95.     During their fifth and sixth years, candidates for tenure prepare descriptive materials and provide copies of their curriculum vitae and other

documents to be used in the creation of an evaluative dossier by the Department Head.

96.     The tenure dossier includes recommendations from external reviewers of equal or greater rank for which the candidate is applying at "peer" (*i.e.*, similarly ranked) universities.  The reviewers must be independent, outside evaluators of the candidates' work.  For instance, a person who is an Assistant Professor up for tenure may only be evaluated by Associate Professors or full Professors[1] at similarly ranked universities.  Professional specialists may be used, but a justification is required.

97.     Although higher ranked evaluators are strongly preferred, the evaluators are not required to be of a higher rank than the rank for which the candidate is applying.

98.     Ms. Benson informed Plaintiff that she needed external reviewers who were the rank of full Professor.

99.     An evaluator may not be a lower rank than the rank for which the Candidate is applying.

100.    The candidates and the Departments each propose a list of four (4) to eight (8) evaluators.  The Department selects two (2) to three (3) evaluators from the candidates' lists, and the Department selects the majority of the evaluators from their own lists of evaluators.  The final decision rests with the Department.

101.    Such evaluators are typically persons to whom the candidate is not significantly connected.

---

[1] The order of ranking for tenure track appointed professors at UIUC for persons similarly situated to Plaintiff is as follows:  Assistant Professor, Associate Professor, and full Professor.

16

102.    Where an evaluator is known to the candidate, the connection must be disclosed, and a specific reason must be given for using that particular evaluator.

103.    External evaluators are solicited by letter and asked to remain neutral.

104.    Upon receiving all relevant information, the P&T Committee at the Department level votes on the application and makes a recommendation to grant or deny tenure, which is then reviewed by the Department Head.

105.    The Department Head subsequently reviews the recommendation to grant or deny tenure and provides a recommendation to the Dean of the College in which the candidate's unit is housed.

106.    Candidates may appeal the recommendation and request reconsideration, seeking the support of the Faculty Advisory Committee.

107.    The Dean of the College housing the candidate's unit then reviews the recommendation and makes his or her own recommendation to the Provost.

108.    The Provost makes the final recommendation to the Board of Trustees as to whether to grant tenure in conjunction with advice from the Campus P&T Committee.

109.    Defendant Board of Trustees then confirms the recommendation regarding the tenure decision.

### C.    Plaintiff's Tenure Process

110.    In May 2012, Plaintiff was hired with a start date of January 16, 2013, which consisted of a partial spring term.

111.    Plaintiff's tenure timeframe of six (6) years was set to begin in the fall of 2013.

112.    Plaintiff was hired and recruited as a multifaceted, nontraditional scholar due to her practical, scholarly, and service experience.

113.    Ms. Slater, Mr. Martin, Mr. Benson, and Mr. Matt Ehrlich (hereinafter "Mr. Ehrlich") (who was a senior faculty member in the Department of Journalism) specifically advised Plaintiff that she would not be made to focus on scholarly research.

114.    Instead, the aforementioned faculty members advised Plaintiff to focus on media work and on quality rather than quantity, although Plaintiff still published a multitude of scholarly articles.

115.    Plaintiff published research papers, submitted numerous papers for competition, and continued to bolster her teaching and service credentials and her creative endeavor, including, but not limited to, the following (which were above and beyond any achievements by her peers in the Department of Journalism):

     a.     publishing multiple award-winning papers to the Broadcast Educators Association, such as "From the Classroom to the Newsroom: Are We Training Them to be Leaders?" Quantitative Study, Broadcast Education Association 2015 Convention;

     b.     publishing a book titled *250 Years and Still a Slave*, Visionary Insight Press in 2015;

     c.     focusing on the development of innovative creative works and media projects, such as "Journey to My Mother's Land" and "A Taste of Gullah;"

     d.     publishing an article titled "Leadership in College Newsroom Labs: It's Transactional," Journalism & Mass Communication

Educator in 2015, which is a scholarly journal managed by the Association for Education in Journalism and Mass Communication (hereinafter "AEJMC"), which also holds a national conference; and

e.  submitting a Research Paper to the 2014 AEJMC National Conference entitled "J-School Gender Gap: Causes and Impacts."

116.  The concerns raised about her tenure application came in part from Ms. Benson, Ms. Craft, and Mr. Martin, who were persons to whom Plaintiff reported the harassment.

117.  Although Plaintiff had the most publications in the Department of Journalism during her first three (3) years of employment at UIUC, the P&T Committee set up a pretext for discrimination against Plaintiff.

118.  In March 2016, Plaintiff had her third-year review in which the P&T Committee discusses a candidate's progress toward tenure.

119.  The P&T Committee showed a lack of understanding of Plaintiff's award-winning research, methodology, practice, and theory called ACE that Plaintiff utilized for, not only *250 Years and Still a Slave*, but also for her teaching, service, creative endeavor, and other publications.

120.  The P&T Committee noted concerns that the book was published by an independent publisher that did not have academic national recognition and did not appear to be peer reviewed.

121.  Plaintiff was advised to submit papers to scholarly journals and to work toward having her creative works broadcasted on a national or international scale, as well as to lead with teaching and service.

122.   On November 18, 2018, Plaintiff submitted a formal response addressing the P&T Committee's concerns and clarified her research methodology for ACE, which was included in her request for reconsideration of her tenure denial.

123.   Despite the concerns raised, the P&T Committee concluded that Plaintiff was making appropriate progress toward tenure.

124.   In order to address the P&T Committee's concerns regarding her creative endeavor and distribution of the same, Plaintiff was instructed by senior faculty members to win a national competition for her creative endeavor.  Therefore, Plaintiff entered her documentary titled "A Taste of Gullah" into the Garifuna International Indigenous Film Festival in 2016.

125.   At said Festival, "A Taste of Gullah" was voted Best Documentary and achieved large-scale national distribution by being aired on public broadcast networks in the State of California, the State of South Carolina, and the State of Illinois.  "A Taste of Gullah" had over three quarters of a million views on YouTube, and over millions of views via broadcast television.  That international competition was peer reviewed by filmmakers from across the world.

126.   In the beginning of 2019, Plaintiff achieved international distribution for her documentary titled "Journey to My Mother's Land" through the Nigerian Television Authority, which was broadcasted across the countries of Africa, Canada, the United Kingdom, and the United States of America via satellite television feeds. Plaintiff took four (4) years and thirty-two (32) days to complete that creative

endeavor, which was another reason why Plaintiff was not expected to focus only on scholarly articles.

127.    In 2016, during a tenure advisor meeting with Plaintiff and Ms. Benson, William Bernhard (hereinafter "Mr. Bernhard") (who preceded Ms. Sulkin as the Vice Provost for Academic Affairs and the College of Media Interim Associate Dean) indicated that Plaintiff had the strongest dossier in the Department of Journalism within the past twenty-five (25) years.

128.    In addition to her awards for "A Taste of Gullah," Plaintiff published numerous papers (which were peer reviewed, intensely competitive, and only led to conference invitations if papers were accepted), including, but not limited to, the following:

> a.    "Teaching Without Borders:  Active Centralized Empowerment" for the Twelfth International Congress of Qualitative Inquiry at UIUC in May 2016;
>
> b.    a research paper on ACE titled "Active Centralized Empowerment:  A Practice of Demarginalization in the Classroom and Community" at the Cultural Impact National Conference in 2017;
>
> c.    a paper and presentation titled "A Taste of Gullah and Documentary Storytelling" in the session, "It's a Film Crew, Not a Class:  Maturing Filmmakers Through International Documentary Projects" for the Broadcast Educators Association in April 2018;
>
> d.    a paper titled "Sports, Women and Jobs" at the session, "It's a Film Crew, Not a Class:  Maturing Filmmakers Through International Documentary Projects" for the Broadcast Educators Association in April 2018;

e.   a paper titled "Issues in the Classroom with Active Centralized Empowerment" at the World Multiconference on Systemics, Cybernetics, and Informatics; and

f.   a chapter titled "Race, Ethnicity, Gender, and the Representations of Power in 1084 Prime-time Commercials in 2005" in the book collection "Feminist Interpretations of Advertising:  What's the Big Idea?" in December 2018.

129.   Plaintiff supported (and was faculty advisor for) the student news group, hearmyvoiceonline.com, which won multiple second place awards as a Best in Digital Entry at the AEJMC in 2017.

130.   In 2018, Plaintiff was named a Kopenhaver Center Fellow among only forty-seven (47) other women.  The Kopenhaver Center Fellowship is awarded by the Lillian Lodge Kopenhaver Center for the Advancement of Women in Communication. Nominees are voted on and selected for leadership and believed to be leaders who can make a difference in communities as well as their professions.

131.   Plaintiff was awarded the Baskett Mosse Award for National Faculty Development at the AEJMC conference for high achievements in teaching, service, creative endeavor, and research that included Hear My Voice and ACE in 2018.

132.   Plaintiff was invited to speak at many conferences, and she gave academic presentations at symposia, including a presentation pertaining to ACE at the peer reviewed Twelfth International Congress of Qualitative Inquiry held at UIUC in 2016.

**D.  The P&T Committee**

133.  The P&T Committee discriminated against Plaintiff by providing inaccurate direction regarding the tenure process and failing to participate in objective evaluation of Plaintiff's merit.

134.  The P&T Committee's actions were discriminatory and designed to ensure that the Department of Journalism would not include a tenured African-American female professor.

135.  The P&T Committee included the following persons:  Ms. Benson (to whom she reported the harassment), Ms. Craft (to whom she reported the harassment), Brian Johnson (hereinafter "Mr. Johnson"), and Leon Dash (hereinafter "Mr. Dash").

136.  In the spring of 2018, Plaintiff began working with Ms. Benson, Ms. Craft, Mr. Johnson, and Mr. Dash in order to finalize her tenure dossier.

137.  C.L. Cole (hereinafter "Ms. Cole"), a professor in the College of Media, was also asked to provide feedback for finalizing Plaintiff's tenure dossier.  However, Ms. Cole and Ms. Craft only attended one single meeting and they were both very positive about Plaintiff's tenure dossier.

138.  In 2015, Mr. Johnson, who was an advisor for Plaintiff's tenure dossier and a board member of the Daily Illini, disparaged the award-winning hearmyvoiceonline.com because he and other senior faculty members could not support that registered organization, as such a newsroom would attract more students of color and other marginalized groups than the Daily Illini.

139.   Mr. Johnson also gave minimal feedback on Plaintiff's tenure dossier.

140.   Mr. Dash only provided one (1) observation regarding Plaintiff's tenure dossier.

141.   Ms. Benson provided Plaintiff with drastically different advice than Plaintiff's prior P&T Committee members, requesting that Plaintiff focus on scholarly work.   However, scholarly work was never intended to be an area of focus for her tenure dossier nor was that type of work focused on by any candidate in the Department of Journalism.

142.   Ms. Benson also did not provide Plaintiff with proper instructions regarding the creation of a website demonstrating her materials to be sent to external reviewers.

143.   Rather, Ms. Benson forced Plaintiff to spend a significant amount of time generating a website that was never provided to external reviewers.

144.   Ms. Benson informed Plaintiff that she could not select external reviewers who were familiar with her field of work, and that Plaintiff needed to select reviewers who were full Professors.

145.   Upon information and belief, other Caucasian male candidates were allowed to select reviewers that were ranked the same, and such Caucasian male candidates were allowed to submit professional specialists without justification in direct contradiction with Provost's Communication No. 9.

146. Plaintiff's field of work is so specialized that very few scholars exist who could properly evaluate her work and who are not connected to Plaintiff professionally.

### E. The P&T Committee Treated Caucasian Male Applicants Favorably

147. In fact, Charles "Stretch" Ledford (hereinafter "Mr. Ledford"), who was a Caucasian male Assistant Professor, was allowed to submit reviewers whom he knew as evaluators of his work. Mr. Ledford was granted tenure in the 2017-2018 academic year.

148. Plaintiff published far more scholarly work than Mr. Ledford. However, a portion of Plaintiff's work was focused on African-American women and other marginalized groups. Additionally, Plaintiff's student evaluations were better than Ledford's.

149. During the year before Mr. Ledford's tenure was granted, the promotion and tenure process was changed to focus on scholarly research.

150. Mr. Ledford was permitted to proceed under the former guidelines emphasizing that creative work was equal to scholarly research, whereas Plaintiff was not allowed to be evaluated under the prior standard despite the fact that her tenure clock began two (2) years later.

151. Mr. Ledford was also allowed to seek additional external reviewers until he finally received the requisite five (5) positive reviews while Plaintiff was not afforded that same opportunity.

152.    In 2021, another colleague, Ben Holden (hereinafter "Mr. Holden"), was granted tenure despite not having substantial scholarly research or creative endeavor.  Mr. Holden is an African-American male.

153.  Upon information and belief, Mr. Holden only received tenure after threatening a lawsuit.

154.    Ms. Benson and Ms. Craft prepared Plaintiff's tenure dossier, and then submitted the dossier to external reviewers and the P&T Committee for review.

155.    Ms. Benson was the presenter of Plaintiff's work to the P&T Committee.

156.    Ms. Benson subsequently received the external reviews as well as a P&T Committee vote to not recommend Plaintiff for tenure.

### F.    The Pretextual Tenure Decision

157.    On October 17, 2018, Plaintiff received notice of the recommendation to not grant her tenure and instead issue a terminal contract.  Plaintiff was provided with the opportunity to request reconsideration by November 1, 2018.

158.    Plaintiff was subsequently approached by two (2) colleagues, Nikki Usher (hereinafter "Ms. Usher") and Eric Meyers (hereinafter "Mr. Meyers"), who informed her that Ms. Benson's presentation of Plaintiff's work to the P&T Committee was extremely poor and made no sense.

159.    Ms. Usher texted Plaintiff, stating that if Plaintiff's work were so poor, then she should have been fired at the end of her third year.  Ms. Usher also told Plaintiff that the presentation was a twenty-first century lynching.

160.   Mr. Meyers informed Plaintiff that he believed that a racial bias was involved in the presentation of Plaintiff's work.

161.   On November 8, 2018, Plaintiff met with the Faculty Appeals Committee and requested reconsideration of the denial of her tenure.

162.   The Faculty Appeals Committee noted several irregularities with Plaintiff's tenure process, including the following:

   a.   the retirement of the majority of persons on the initial P&T Committee;

   b.   changes in the promotion and tenure statement from the 2015-2016 academic year to the 2016-2017 academic year, such as less of a focus on creative endeavor and more on scholarly research;

   c.   a failure to properly evaluate the distribution of Plaintiff's work, such as considering the regional and international airing of her creative endeavors; and

   d.   the harassment and ongoing discrimination by Defendant Erdey, thereby creating a hostile work environment.

163.   Plaintiff was also advised to seek legal counsel, by both the Faculty Appeals and the two (2) aforesaid colleagues who approached her, as well as by high-ranking administrators.

164.   Plaintiff's request for reconsideration was granted, although upon review, the decision to deny tenure was upheld by the P&T Committee.

165.   On November 13, 2018, Plaintiff received a denial letter from the P&T Committee.

166.   On November 27, 2018, Ms. Sulkin reviewed the materials provided by Plaintiff and the P&T Committee's recommendation.

167.    Ms. Sulkin recommended to Provost Cangellaris that Plaintiff be denied tenure and be issued a terminal contract for the 2019-2020 academic year.

168.    On December 6, 2020, Plaintiff received notice from Provost Cangellaris regarding his recommendation that she be issued a terminal contract for the 2019-2020 academic year.

169.    Thereafter, Plaintiff immediately sought the assistance of the Faculty Appeals Committee, but they informed her to seek legal counsel instead.

170.    Plaintiff then went to the Academic Freedom Committee, which expressed an interest in taking her case, but ultimately, Plaintiff was told that the Committee could not take the case because Plaintiff had not yet received tenure and then been stripped of tenure.

171.    Plaintiff also requested that Ms. Craft, Ms. Sulkin, and Provost Cangellaris schedule a meeting regarding why she was denied tenure, although she never received a response.

172.    Plaintiff had a brief discussion about the tenure process in a meeting with Ms. Sulkin held on August 2, 2019.

173.    Plaintiff became aware that, during the tenure process, Defendant Erdey had made numerous negative and racial remarks about Plaintiff to Ms. Benson and other members of the P&T Committee.

174.    On August 19, 2019, Plaintiff received her terminal contract.

## G.      Post-Tenure Denial and Hostile Work Environment

175.    After her tenure was denied, Plaintiff began to notice that her colleagues spoke less to her and only trusted friends, such as Anne Reisner (hereinafter "Ms. Reisner") and Mr. Ledford, continued to speak with her.

176.    Plaintiff noticed that the colleagues who were uncomfortable with the presentation of her work at the P&T Committee stopped speaking to her.

177.    Ms. Reisner confided in Plaintiff that her colleagues had been instructed to not speak with Assistant Professors in the College of Media who had been denied tenure.

178.    Plaintiff was the only person matching the description of an Assistant Professor in the College of Media who had been denied tenure.

179.    Despite her position as Assistant Professor, Plaintiff's work was excluded from an accreditation evaluation prepared by the AEJMC for the Department of Journalism during the 2018-2019 academic year.

180.    Plaintiff worked tirelessly to prepare the Department of Journalism for that accreditation evaluation, as Plaintiff had assisted in such an evaluation with her prior employer, Eastern Illinois University.

181.    In the section of the accreditation evaluation report detailing academic contributions and achievements by faculty, Plaintiff's work was not listed, although she was still an Assistant Professor.

**H.      Plaintiff's Attempts to Seek Recourse**

182.     In July 2019, Plaintiff submitted an intake questionnaire and met with Investigator Shwun Hayes (hereinafter "Mr. Hayes) at the Equal Employment Opportunity Commission (hereinafter "EEOC").

183.     Plaintiff prepared a written document requesting remedial action, describing the harassment and discrimination that she experienced, and documenting the denial of tenure.  A copy of that document is attached hereto as Exhibit A; a declaration signed by Plaintiff is attached hereto as Exhibit B.

184.     Plaintiff was advised that, until her tenure denial became official, she would not have suffered harm.  A copy of Mr. Hayes's notes is attached as Exhibit C.

185.     Since her contract was subsequently terminated by Defendant Board of Trustees on June 1, 2020, Plaintiff was forced to "retire" from UIUC so that she would have a chance of obtaining future employment.

186.     On or about December 21, 2020, Plaintiff filed an EEOC charge pertaining to the denial of tenure, retaliation for negative references, improperly contested unemployment, and failure to prevent harassment.  A copy of that EEOC charge is attached hereto as Exhibit D.

187.     The harassment and discrimination ceased on or about March 16, 2020 only as a result of the physical closure of UIUC's campus due to the COVID-19 pandemic.

188.     Plaintiff has thus timely filed a charge relating to the harassment and denial of unemployment benefits.

189.   Plaintiff received her right to sue letter on or about March 16, 2021.

190.   Plaintiff would have filed her claim regarding the tenure denial within three hundred (300) days of December 8, 2018 when Plaintiff received notice that she was not recommended for tenure, but for the advice provided by Mr. Hayes of the EEOC.

191.   Nonetheless, Plaintiff did make a request for remedial action verbally and in writing on July 16, 2019.

**I.     2019-2020 Academic Year**

192.   During the course of her terminal contract for the 2019-2020 academic year, Plaintiff began seeking other employment.

193.   Plaintiff had several successful interviews, including one (1) interview at the University of Kentucky, but she received no offers of employment after providing employment references.

194.   Mr. Ledford served as a reference for Plaintiff's University of Kentucky application, and texted her that the interviewer specifically inquired about the harassment that Plaintiff experienced as a result of Defendant Erdey's conduct.  Mr. Ledford also stated that the interviewer requested details as to why Plaintiff never appealed her tenure denial.

195.   Plaintiff had a second interview with the University of Kentucky, although she did not receive an offer of employment after her references were contacted about the tenure denial (and no appeal thereto) and harassment by Defendant Erdey.

196.    Plaintiff was shocked because she had never revealed Defendant Erdey's identity, and Plaintiff concluded that UIUC employees must have informed her references of her situation involving Defendant Erdey.

197.    In order to make negative references, an individual in the Provost's Office or higher must specifically approve the language used.

198.    After the second interview at the University of Kentucky, Plaintiff had several additional interviews, including at the following universities:  American University, University of California at Los Angeles, Virginia State University, Old Dominion University, Savannah State University, Harvard University, University of California at Berkeley, Boston University, Northwestern University, California State University at Los Angeles, North Carolina Agricultural and Technical State University, Norfolk State University, and Howard University.

199.    Notwithstanding said numerous interviews at universities, Plaintiff received no offers of employment for tenure track Associate Professor positions.

**J**.    **Life Insurance Policy**

200.    In June 2020, Plaintiff attempted to access her life insurance policy funds, although she was told by administrators that she could not access such funds because she had been terminated as an employee.

201.    Upon information and belief, designating non-reappointed employees as terminated employees is improper.

IV.  **CAUSES OF ACTION**

**COUNT I**
**RACE-BASED DISCRIMINATION**
**Defendant Board of Trustees**

202.  Plaintiff incorporates by reference and re-alleges the allegations set forth in paragraphs 1 through 201, as if fully restated and re-written herein.

203.  Defendant Erdey repeatedly harassed, belittled, and discriminated against Plaintiff by making stereotypical remarks concerning African-Americans and women.

204.  Defendant Erdey entered Plaintiff's classrooms, acted as a co-teacher in classes where he was not appointed as a co-teacher, and purposely sabotaged equipment.

205.  Defendant Erdey harassed and discriminated against Plaintiff for the reason that he felt intimidated by Plaintiff's success as an African-American female.

206.  Defendant Erdey's conduct violated Title VII by depriving Plaintiff of the right to have a workplace free of discrimination based upon her racial status.

207.  Plaintiff made several persons, including Ms. Benson and Mr. Martin, aware of the harassment and discrimination by Defendant Erdey based upon her race.  Said persons had the ability to take corrective actions on Plaintiff's behalf, although nothing was done.

208.  Since employees had knowledge of the harassment and discrimination and did not take any corrective actions, Defendant Board of Trustees, as their employer, is liable for their conduct or lack thereof.

33

## COUNT II
## GENDER-BASED DISCRIMINATION
### Defendant Board of Trustees

209.   Plaintiff incorporates by reference and re-alleges the allegations set forth in paragraphs 1 through 208, as if fully restated and re-written herein.

210.   The harassment and discrimination by Defendant Erdey were severe and pervasive, occurring nearly every day, without abating.

211.   Such harassment and discrimination deeply impacted Plaintiff's ability to work and live her life normally.

212.    Plaintiff made several persons, including Ms. Benson, Ms. Craft, and Mr. Martin, aware of the harassment and discrimination by Defendant Erdey based upon her gender.  Said persons had the ability to take corrective actions on behalf of Plaintiff, although nothing was done.

213.   Since employees had knowledge of the harassment and discrimination against Plaintiff and did not take any corrective actions, Defendant Board of Trustees, as their employer, is liable for their conduct or lack thereof.

## COUNT III
## FAILURE TO PREVENT HOSTILE WORK ENVIRONMENT
### Defendant Board of Trustees

214.   Plaintiff incorporates by reference and re-alleges the allegations set forth in paragraphs 1 through 213, as if fully restated and re-written herein.

215.   Defendant Erdey's conduct caused Plaintiff to endure a hostile work environment based upon her race and sex.

34

216.   Plaintiff suffered extreme harassment and discrimination by Defendant Erdey based upon her race and sex.  Such harassment was known to Defendant Board of Trustees, although nothing was done.

217.   Since employees had knowledge of the harassment and discrimination by Defendant Erdey and did not take any corrective actions, Defendant Board of Trustees, as their employer, is liable for their conduct or lack thereof.

**COUNT IV**
**FAILURE TO PROMOTE AND CONSTRUCTIVE TERMINATION DUE TO RACIAL AND GENDER-BASED DISCRIMINATION**
**Defendant Board of Trustees**

218.   Plaintiff incorporates by reference and re-alleges the allegations set forth in paragraphs 1 through 217, as if fully restated and re-written herein.

219.   Ms. Benson, as the Head of the P&T Committee and Head of the Department of Journalism, as well as Plaintiff's longest remaining advisor, repeatedly and unexpectedly changed the guidelines of the tenure process for Plaintiff.  The only possible explanation for such changes is racial- and gender-based discrimination.

220.   Plaintiff was held to a higher standard than Mr. Ledford, who was also a tenure candidate but was a Caucasian male, because Plaintiff was required to focus on scholarly work and national creative endeavor whereas Mr. Ledford only needed to demonstrate creative endeavor.

221.   Unlike Mr. Ledford, Plaintiff was not allowed to have evaluators that were familiar with her because Ms. Benson favored a Caucasian male comparator over Plaintiff who is an African-American female.

222.    Ms. Benson and Mr. Johnson made Plaintiff make changes to a website showcasing her tenure materials without clear guidance, and the website was not utilized.

223.    Ms. Benson provided such a poor presentation of Plaintiff's work during a P&T committee vote in which multiple observers indicated said presentation was race-based discrimination.

224.    Plaintiff is also aware of an African-American male comparator who was granted tenure despite being less accomplished than Plaintiff.

225.    Ms. Craft reviewed the process of the P&T Committee and deemed said process to be fair, despite being aware of severe racial issues.

226.    Ms. Sulkin reviewed the P&T Committee's process and allegedly determined that said process was fair, but did not provide any justification or reasons therefor.

227.    Ms. Benson's conduct violated Title VII for failing to grant tenure and promote Plaintiff (although less qualified comparators receiving tenure), conducting a faulty review, and failing to address race- and gender-discrimination despite being placed on notice of the same.

228.    As Ms. Benson, Ms. Craft, and Ms. Sulkin were acting in their official capacities, Defendant Board of Trustees, as their employer is liable for their conduct.

229.    Plaintiff received a notice of non-reappointment and a terminal contract, and thus, Plaintiff was forced to retire rather than have a termination on her record.

## COUNT V
## RETALIATION
### Defendants Board of Trustees

230.     Plaintiff incorporates by reference and re-alleges the allegations set forth in paragraphs 1 through 229, as if fully restated and re-written herein.

231.     Plaintiff experienced retaliation for her continual reporting of the harassment and discrimination by Defendant Erdey and attempting to seek recourse for her tenure denial.

232.     Such retaliation primarily consisted of negative references to Plaintiff's prospective employers, and an incident in which an administrator of the College of Media ordered employees not to speak with Assistant Professors who had been denied tenure.  Plaintiff was the only person who fit said description.

233.     Such aforesaid conduct clearly violates Title VII.

## COUNT VI
## FAILURE TO PROMOTE IN VIOLATION OF 740 ILCS 23/5
### Defendant Board of Trustees

234.     Plaintiff incorporates by reference and re-alleges the allegations set forth in paragraphs 1 through 233, as if fully restated and re-written herein.

235.     As a direct and proximate result of the actions described above, Plaintiff has been damaged by the Defendants' decision to deny her tenure as an Associate Professor at UIUC.

## COUNT VII
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### Defendant Erdey

236.   Plaintiff incorporates by reference and re-alleges the allegations set forth in paragraphs 1 through 235, as if fully restated and re-written herein.

237.   Defendant Erdey engaged in conduct that was extreme and outrageous by:   directing Plaintiff to repeatedly interact with Defendant Erdey who subjected her to harassment and discrimination, failing to investigate or mitigate the harassment and discrimination, and retaliating against her for reporting the harassment and discrimination.

238.   Such actions were extreme and outrageous, and were known to cause or be likely to cause extreme distress.

239.   As a result of Defendants' actions, Plaintiff has suffered and will continue to suffer significant emotional distress.

## COUNT VIII
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### Defendant Erdey

240.   Plaintiff incorporates by reference and re-alleges the allegations set forth in paragraphs 1 through 239, as if fully restated and re-written herein.

241.   Defendant Board of Trustees, by and through its agents, including, but not limited to, Defendants Benson and Ms. Sulkin, had a duty to ensure Plaintiff had a safe working environment.

242. Defendant Board of Trustees failed to carry out that duty, and instead, engaged in a course of conduct that involved condoning harassment, allowing employees to shun Plaintiff, and forcing Plaintiff to interact with a harasser.

243. Plaintiff has suffered severe physical and emotional damage due to Defendant Board of Trustees' negligent conduct.

## V. **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, JANICE COLLINS, prays for judgment against Defendants, THE BOARD OF TRUSTEES OF THE UNIVERSITY OF ILLINOIS and KENNETH ERDEY, as follows:

A. For an order as to Count I granting Plaintiff an award of monetary relief in the form of compensatory damages as provided by statute under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000, *et seq.,* for discrimination based upon race;

B. For an order as to Count II granting Plaintiff an award of monetary relief in the form of compensatory damages as provided by statute under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000, *et seq.,* for discrimination based upon gender;

C. For an order as to Count III granting Plaintiff an award of monetary relief in the form of compensatory damages as provided by statute under Title VII of the Civil Rights Act of 1964, 42 U.S.C §§ 2000, *et seq*., for failure to prevent a hostile work environment;

D.      For an order as to Count IV granting Plaintiff an award of monetary relief in the form of compensatory damages as provided by statute under Title VII of the Civil Rights Act of 1964, 42 USC. §§ 2000, *et seq.,* for failure to promote and for constructive termination due to racial- and gender-based discrimination;

E.      For an order as to Count V granting Plaintiff an award of non-pecuniary damages and monetary relief in the form of compensatory damages as provided by statute under Title VII of the Civil Rights Act of 1964, §§ 2000, *et seq.,* for retaliation due to discrimination;

F.      For an order as to Count VI granting Plaintiff an award of monetary relief in the form of actual damages as provided by statute pursuant to the Illinois Civil Rights Act of 2003, 740 ILCS 23/5, for failure to promote due to discrimination;

G.      For an order as to Count VII granting Plaintiff an award for monetary relief in the form of compensatory damages for intentional infliction of emotional distress;

H.      For an order as to Count VIII granting Plaintiff an award for monetary relief in the form of compensatory damages for negligent infliction of emotional distress;

I.      For an order granting Plaintiff tenure as Associate Professor at UIUC, and if not possible, then providing Plaintiff with documentation that she

obtained the rank of Associate Professor and providing Plaintiff with neutral references for her employment search.

J.      For actual, direct, incidental, consequential, and/or statutory damages in such amounts that will be proven at trial, as appropriate for each cause of action;

K.      For equitable relief as appropriate for each cause of action alleged herein;

L.      For costs of suit and attorneys' fees incurred, as allowable by law;

M.      For pre-judgment and post-judgment interest, as allowable by law; and

N.      For any such other and further relief as the Court deems equitable and just.

O.      For equitable relief sought in Counts I to V, including reinstatement of Plaintiff's life insurance policy and for payment of sick days and backpay pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C §§ 2000, *et. seq.*

## VI. <u>DEMAND FOR JURY TRIAL</u>

Plaintiff, JANICE COLLINS, demands a trial by jury on all claims so triable.

Dated this 14th Day of June, 2021

Respectfully Submitted,

JANICE COLLINS

By:  <u>/s/ Thomas G. Gardiner</u>
        One of Plaintiff's Attorneys

Thomas G. Gardiner (IL ARDC# 6180243)
GARDINER KOCH WEISBERG & WRONA
Attorney for the Plaintiff
53 West Jackson Boulevard, Suite 950
Chicago, Illinois  60604
Telephone:  (312) 362-0000
Facsimile:  (312) 362-0440
E-mail:       tgardiner@gkwwlaw.com