E-FILED
Tuesday, 24 August, 2021  04:56:41 PM
Clerk, U.S. District Court, ILCD

5442-354
BMS/KHA/tlp

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | | | |
|---|---|---|---|
| JANICE COLLINS, individually, | ) | | |
| | ) | | |
| Plaintiff, | ) | | |
| | ) | | |
| vs. | ) | No.: | 21-cv-02136-CSB-EIL |
| | ) | | |
| THE BOARD OF TRUSTEES OF THE UNIVERSITY OF | ) | | |
| ILLINOIS, an Illinois public entity, and | ) | | |
| KENNETH ERDEY, individually, | ) | | |
| | ) | | |
| Defendants. | ) | | |

### MOTION TO DISMISS PLAINTIFF'S COMPLAINT PURSUANT TO 12(b)(6)
### AND MEMORANDUM OF LAW IN SUPPORT THEREOF

NOW COME the Defendants, THE BOARD OF TRUSTEES OF THE UNIVERSITY OF ILLINOIS,

an Illinois public entity, and KENNETH ERDEY, by Brian M. Smith of Heyl, Royster, Voelker & Allen,

and for their Rule 12(b)(6) Motion to Dismiss Plaintiff's Complaint and Memorandum of Law In

Support, state as follows:

### INTRODUCTION

This lawsuit stems from Plaintiff's allegations that she suffered a hostile work environment,

race discrimination, and retaliation while employed at the University of Illinois, Urbana Campus

("UIUC") as an Assistant Professor. Plaintiff, an African-American female, was hired as a Professor

of Broadcast Journalism in spring 2013, with her tenure track beginning in August 2013. Plaintiff

claims that shortly after she was hired in 2013, she began getting harassed by one of her

coworkers, Mr. Erdey, a white male. Ultimately, Plaintiff claims that she was denied tenure as a

result of racial discrimination, and in retaliation for complaining about Mr. Erdey's behavior.

Throughout Plaintiff's Complaint, she uses conclusory legal language such as "racially charged" and "racial harassment" when describing Mr. Erdey's behavior. While Plaintiff attempts to demonstrate racial animus to African Americans by labeling her disagreements as racial harassment, the Complaint describes nothing more than common workplace conflicts. Plaintiff's conclusory references to race in the Complaint alone are not enough to create the inference that Plaintiff was subject to a racially hostile work environment while at UIUC, and therefore, this Court should dismiss Plaintiff's Complaint. Furthermore, the crux of Plaintiff's Complaint is that she does not believe she should have been denied tenure. While she attempts to cloak the decision as one motivated by race and retaliation, allowing this case to proceed will involve this Court substituting its judgment for the judgment of the UIUC committee that made the tenure decision. As courts have long recognized, tenure decisions rely on subjective judgments about academic potential and qualification. Plaintiff offers no specific facts that the decision to deny her tenure was based on her race and sex. As such, Plaintiff's Complaint should be dismissed for failure to state a claim upon which relief can be granted.

## ARGUMENT

### I.     Legal Standard

When considering a Rule 12(b)(6) motion to dismiss, the court accepts as true all well-pleaded facts in the plaintiff's Complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). To survive a Rule 12(b)(6) motion, the Complaint must not only provide the defendant with fair notice of a claim's basis but must also be facially plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); see also *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff

pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Conclusory legal statements nor abstract recitations of the elements of a cause of action do not help a complaint survive a Rule 12(b)(6) motion. *Swanson v. Citibank*, N.A., 614 F.3d 400, 405 (7th Cir.2010). The facts in the Complaint must raise a reasonable expectation that discovery will reveal evidence to support liability for the wrongdoing alleged. *Adams v. City of Indianapolis*, 742 F.3d 720 (7th Cir. 2014).

## II.    Plaintiff's Title VII Claims are Time-Barred

Before filing an employment discrimination lawsuit in federal court, a would-be plaintiff must file an EEOC charge within 300 days of the conduct underlying the discrimination claim. 42 U.S.C. § 2000e-5(e)(1); *Moore v. Vital Prods., Inc.*, 641 F.3d 253, 256 (7th Cir. 2011). Any complaint of conduct occurring more than 300 days before the filing of the EEOC charge is time-barred. *Id*. Under the notice rule, the 300-day limitations period commences "at the time the [employment decision] was made and communicated to [the employee]." *Del. State Coll. v. Ricks*, 449 U.S. 250, 258, 66 L. Ed. 2d 431, 101 S. Ct. 498 (1980). The period begins to run when the employee knows he has been injured, "not when [he/she/they] determines that the injury was unlawful." *Sharp v. United Airlines, Inc.*, 236 F.3d 368, 372 (7th Cir. 2001) (quoting *Thelen v. Marc's Big Boy Corp.*, 64 F.3d 264, 267 (7th Cir. 1995)). "[A]n ordinary [Title VII] wrongful-discharge claim accrues – and the limitations period beings to run – when the employer notifies the employee he is fired, not on the last day of his employment." *Green v. Brennan*, 136 S. Ct. 1769, 1782 (2016) (citing *Ricks*, 449 U.S. at 258-59).

In the present case, Plaintiff was notified, at the latest, of the employment decision made by the University on December 6, 2018. (Complaint, ¶78). Plaintiff was notified that her tenure application was denied in October 2018. (Complaint, ¶157). After Plaintiff appealed that decision, on December 6, 2018, UIUC notified Plaintiff that her appeal was denied, that a request for a notice of non-reappointment would be made and that she would be offered a terminal contract for the 2019-2020 academic year. The basis for Plaintiff's claims is that she was denied tenure because of her race, sex, and because of the harassment by her colleague. Plaintiff's EEOC Charge was filed on December 17, 2020. This is well over the 300-day limitations period. Thus, Plaintiff' claims are time-barred.

Plaintiff attempts to justify waiting until December 2020 to file her EEOC Charge by arguing that the EEOC informed her in July of 2019 that she would not suffer harm until her tenure denial became official. (Complaint, ¶184). Plaintiff attached to the Complaint notes from the EEOC Investigator regarding his conversation with Plaintiff, which state as follows: "[Plaintiff] was informed that until her denial for Tenure is official, she has not suffered harm in this regard but she still maintains the right to file a charge. [Plaintiff] declined to file a charge today but will return once her tenure is officially denied. I advised [Plaintiff] of her 300 days." (See Exhibit C to the Complaint, d/e #1-4, p. 2). When Plaintiff went to the EEOC in July of 2019, her tenure had already been officially denied for over six months. By her own admission, Plaintiff was informed of the decision to deny her tenure and the decision to issue her a terminal contract in December of 2018. (Complaint, ¶78). At this point, Plaintiff had been informed of the original recommendation to deny her tenure, she had appealed that decision, had been informed that all levels of appeal upheld the decision to deny her tenure, and was notified that she would be receiving a terminal

contract. The decision to deny tenure became official in December 2018. There was nothing that occurred after 2018 that would change the course of Plaintiff's tenure track as she had exhausted all of her appeals.

Plaintiff's reliance on the conversation with the Investigator as justification that she should wait to file her Charge is misplaced and misconstrues what the Investigator actually informed her. Plaintiff was advised that she had 300 days to file her charge of discrimination after the denial of her tenure. She waited over 600 days after the denial of her tenure was official to file a charge. Accordingly, her claim is time-barred.

In an almost identical case, the Supreme Court addressed a continuing violation claim in determining the timeliness of an EEOC discrimination charge. See *Delaware State College v. Ricks*, 449 U.S. 250, 66 L. Ed. 2d 431, 101 S. Ct. 498 (1980). Ricks, a college professor, was denied tenure, but was then given a one-year "terminal" contract by the college. In attempting to delay the accrual of his cause of action, Ricks argued that the college's conduct constituted a "continuing violation" of the civil rights laws because "discrimination motivated the College not only in denying him tenure, but also in terminating his employment" upon the expiration of his subsequent one-year contract. *Id*. at 257. As a result, according to Ricks, the limitations period did not begin to run until his one-year contract expired.

The Court initially observed that "determining the timeliness of Ricks' EEOC complaint, and this ensuing lawsuit, requires us to identify precisely the 'unlawful employment practice' of which he complains." *Id*. The Court found that Ricks' complaint did not support his continuing violation argument because it did not allege discriminatory conduct by the college after denying Ricks tenure. "If Ricks intended to complain of a discriminatory discharge, he should have identified the

alleged discriminatory acts that continued until, or occurred at the time of, the actual termination of his employment." *Id.*

The fact that Ricks did not feel the effect of the college's alleged discrimination until he was discharged was insufficient to postpone his claim's accrual. The *Ricks* Court recognized a crucial distinction between the present effects of a one-time violation and the continuation of the violation into the present:

> It appears that termination of employment at Delaware State is a delayed, but inevitable, consequence of the denial of tenure. In order for the limitations periods to commence with the date of discharge, Ricks would have had to allege and prove that the manner in which his employment was terminated differed discriminatorily from the manner in which the College terminated other professors who also had been denied tenure. But no suggestion has been made that Ricks was treated differently from other unsuccessful tenure aspirants. Rather, in accord with the College's practice, Ricks was offered a 1-year "terminal" contract, with explicit notice that his employment would end upon its expiration.
>
> In sum, the only alleged discrimination occurred -- and the filing limitations periods therefore commenced -- at the time the tenure decision was made and communicated to Ricks. That is so even though one of the effects of the denial of tenure -- the eventual loss of a teaching position -- did not occur until later.

*Id.* at 257-58. The Court thus concluded that "the limitations periods commenced to run when the tenure decision was made and Ricks was notified." *Id.* at 259. The Supreme Court and Seventh Circuit have continued to apply the *Ricks* accrual rule. See *Green v. Brennan*, 136 S. Ct. at 1782; *Wrolstaf v. Cuna Mut. Ins. Soc'y*, 911 F. 3d 450, 456 (7th Cir. 2018). Collins claim that she was unlawfully denied tenure is clearly time barred.

With respect to harassment claim, Plaintiff alleges that it continued until March 5, 2020. (Complaint, ¶183). However, the allegations of harassment following the 2018 meeting between Collins and her colleague is sparse and conclusory. (See Complaint, ¶¶180-83). Collins claims that

she continued to complain about the harassment, but offers no details about how she complained (oral v. written), and when the continued harassment occurred.

Because Plaintiff alleges that she knew she had been denied tenure in December 2018, and does not allege any harassment, beyond bare conclusions, that occurred after the 2018 meeting, her Title VII claims, which were filed more than 300 days from these dates, are time-barred and should be dismissed.

## III.     Counts I and II should be dismissed as they are duplicative of Count III.

To succeed on a Title VII claim, the plaintiff must prove three elements: [1] she is a member of a class protected by the statute, [2] that she has been the subject of some form of adverse employment action (or that she has been subjected to a hostile work environment), and [3] that the employer took this adverse action on account of the plaintiff's membership in the protected class. *Abrego v. Wilkie*, 907 F.3d 1004, 1012-1013, 2018 U.S. App. LEXIS 30700, *9-11, (7th Cir. 2018)(citing *Morgan v. SVT, LLC*, 724 F.3d 990, 995 (7th Cir. 2013)). The legal standard used to evaluate a discrimination claim "is simply whether the evidence," considered as a whole, "would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).

Counts I and II purport to be claims of race and sex discrimination, respectively. However, the facts Plaintiff alleges in support of her claims are really just complaints of a hostile work environment due to the conduct of Mr. Erdey. Plaintiff does not allege any adverse employment action in Counts I and II. The adverse employment action is set forth in Counts IV and V, which describe the failure to extend tenure to Plaintiff as a result of race discrimination, sex

discrimination, and retaliation. As such, Counts I and II should be dismissed, as they are duplicative of Count III, which alleges a hostile work environment.

## IV. Count III should be dismissed because Plaintiff failed to allege a hostile work environment.

### A. Plaintiff has failed to allege that Defendant Erdey's conduct was "severe and pervasive" or that his conduct was motivated by Plaintiff's race or sex.

Title VII ... forbids employers from requiring people to work in a discriminatorily hostile or abusive environment. *Boss v. Castro*, 816 F.3d 910, 919-20 (7th Cir. 2016). "When 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or [pervasive] to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated." *Id.* at 920 (*quoting Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014)). A Complainant must present evidence demonstrating "(1) the work environment was both objectively and subjectively offensive; (2) the harassment was based on membership in a protected class or in retaliation for protected behavior; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability." *Id*.

In evaluating whether the conduct was "severe or pervasive", courts consider the totality of circumstances, examining factors such as: "the frequency of improper conduct, its severity, whether it is physically threatening or humiliating (as opposed to a mere offensive utterance), and whether it unreasonably interferes with the employee's work performance." *Abrego v. Wilkie*, 907 F.3d 1004, 1015, 2018 U.S. App. LEXIS 30700, *16-17 (7th Cir. 2018). However, "not every perceived unfairness in the workplace may be ascribed to discriminatory motivation merely because the complaining employee belongs to a racial minority." *Beamon v. Marshall & Ilsley Trust Co*., 411 F.3d 854, 863 (7th Cir. 2005). Rather, the alleged harassment must be sufficiently connected to

race "before it may reasonably be construed as being motivated by the defendant's hostility towards the plaintiff's race. *Id*. at 863-64.

### B. Plaintiff has failed to allege a prima facie case of a hostile work environment because UIUC took corrective action to address Plaintiff's complaints.

An employer may be held responsible for coworker on coworker harassment "only if the employer knew or should have known about [the coworker]'s acts of harassment and fails to take appropriate remedial action." *Berry v. Delta Airlines*, 260 F.3d 803, 811, 2001 (7th Cir. 2001) (citing *McKenzie v. Illinois Dept. of Transp.*, 92 F.3d 473, 480 (7th Cir. 1996)). However, if an employer takes reasonable steps to discover and rectify the harassment of its employees . . . it has discharged its legal duty. *Id*. (emphasis added). An employer's response to alleged instances of employee harassment must be reasonably calculated to prevent further harassment under the particular facts and circumstances of the case at the time the allegations are made. *Id*.

In the present case, UIUC denies that a hostile work environment existed. First, the conduct described by Plaintiff is not severe or pervasive. Second, the conduct was not based on her race, color or sex, and finally, there is no basis for employer liability since UIUC took appropriate remedial action to address the conflict between Plaintiff and the other employee.

In her Complaint, Plaintiff describes instances where Mr. Erdey told her she was "stupid," "intimidating," "angry," and "aggressive." (See Complaint, ¶¶26-28). Mr. Erdey also allegedly criticized her teaching style. However, courts have held that claims that a coworker was "short tempered," "hostile," "unfairly critical" or "disrespectful" were insufficient to demonstrate a workplace "permeated with discriminatory intimidation, ridicule and insult." *Abrego*, 907 F.3d at 1015. In short, the conduct described by Plaintiff is, at worst, a rude colleague who she believes criticized her unfairly. It is not a workplace that was objectively offensive, severe or pervasive.

Additionally, there are no facts alleged that indicate that Mr. Erdey's behavior was based on Plaintiff's race, color or sex. Plaintiff has not alleged one specific fact that Mr. Erdey used racial slurs, racial epithets, or used any language that specifically mentioned her race or sex. While Plaintiff states "[s]uch insults are rooted in historical racial stereotypes of the angry black woman and of black women lacking intelligence," this is a conclusory statement and speculation by Plaintiff. Courts may not consider such conclusory statements when ruling on the legal sufficiency of Plaintiff's claims in a Motion to Dismiss pursuant to 12(b)(6). (see above). Interestingly, on the one occasion where Plaintiff indicates that Mr. Erdey sent her "racially charged and threatening text messages," she offers zero detail or any specifics on what was said in those text messages. Instead, Plaintiff just relies on her conclusory statements that the texts were "racially charged." In short, Plaintiff does not allege any facts, aside from her own speculation, that Mr. Erdey's comments were racially or sexually motivated.

Finally, there is no basis for employer liability in this case because the University took steps to resolve the issues between Plaintiff and Mr. Erdey. An employer can avoid liability for harassment that violates Title VII only by showing that it took "immediate and appropriate corrective action." 29 C.F.R. § 1604.11; *Parkins v. Civil Constructors*, 163 F.3d 1027, 1034 (7th Cir. 1998)).

In the Complaint, Plaintiff cites to numerous actions UIUC took to address Plaintiff's concerns with Mr. Erdey: 1) UIUC connected Plaintiff with other individuals and mentors in an attempt to help Plaintiff deal with her conflict with Mr. Erdey and also assist in her professional development (Complaint, ¶33); 2) relocated Plaintiff to a different building so she would not encounter Mr. Erdey on a regular basis (Complaint, ¶36); and 3) UIUC spoke to Mr. Erdey and

instructed him to stay out of Plaintiff's classrooms (Complaint, ¶47). Plaintiff even directly admits: "While Mr. Martin attempted to help Plaintiff…" (Complaint, ¶51). By Plaintiff's own admission, UIUC took repeated and immediate actions to address Plaintiff's concerns when she raised them.

UIUC even went as far as setting up a meeting between Plaintiff and Mr. Erdey so they could discuss their conflict and come up with some potential resolutions. (Complaint, ¶¶65-71). After the meeting, both parties were asked to draft a summary of the meeting. By Plaintiff's own admission in the Complaint, she did not mention at any point in the report to UIUC any kind of gender or race-based discrimination on the part of Mr. Erdey. (Complaint, ¶71). UIUC had a follow-up meeting with Plaintiff after her meeting with Mr. Erdey. (Complaint, ¶72). UIUC also asked that both parties make weekly reports to discuss their progress, and also suggested that the parties attend a mediation session. (Complaint, ¶75).

Plaintiff may try to argue that the corrective action taken by UIUC was not sufficient, and was not the most effective method to address the situation. However, a Title VII defendant is not required to take the most effective action possible to avoid liability. *Zupan v. Illinois*, 1999 U.S. Dist. LEXIS 7776, *15 (N.D. Ill. March 30, 1999). See also *Berry v. Airlines*, 260 F.3d 803, 811 (7th Cir. 2001) ("If an employer takes reasonable steps to discover and rectify the harassment of its employees . . . it has discharged its legal duty.") (quoting *McKenzie v. Ill. Dep't of Transp.*, 92 F.3d 473, 480 (7th Cir. 1996)). The law does not even require that the employer's actions prevent harassment, but merely that its response was reasonably likely to prevent future harassment. *Parkins v. Civil Constructors*, 163 F.3d 1027, 1036 (7th Cir. 1998) (citing *Saxton v. American Tel. & Tel. Co.*, 10 F.3d 526, 536 (7th Cir. 1993)).

While Plaintiff may dispute the efficacy of the corrective actions taken by UIUC, it is undisputed that UIUC took immediate action to address Plaintiff's complaints whenever she made them, and those actions were reasonably likely to prevent future harassment. Moreover, it is not even clear that UIUC was aware that Plaintiff was making claims of racial or sexual harassment. Plaintiff brought her concerns about her conflict with Mr. Erdey to UIUC, but Plaintiff admits in her Complaint that when she made the report of her meeting with Mr. Erdey, she did not tell UIUC that any of Mr. Erdey's behavior was motivated by Plaintiff's race or sex. Plaintiff claims that she did not do that because "Plaintiff feared raising issues related to such inappropriate conduct given Defendant Board of Trustees' persistent failure to address her concerns and complaint." (Complaint, ¶71). Plaintiff cannot fail to report race or gender-based harassment and then complain that no action was taken to stop it. Plaintiff's Complaint alleges that she and Mr. Erdey did not get along. It fails to allege that gender or race played any role; much less that UIUC was made aware that the nature of Plaintiff's complaint about Mr. Erdey were rooted in race or gender harassment and discrimination.

**V.    Count IV should be dismissed as Plaintiff has failed to state a claim of race or sex discrimination.**

Plaintiff has alleged a Title VII discrimination claim (Count IV). To succeed on a Title VII claim, the Plaintiff must prove three elements: [1] she is a member of a class protected by the statute, [2] that she has been the subject of some form of adverse employment action (or that she has been subjected to a hostile work environment), and [3] that the employer took this adverse action on account of the Plaintiff's membership in the protected class. *Abrego v. Wilkie*, 907 F.3d 1004, 1012-1013, 2018 U.S. App. LEXIS 30700, *9-11, (7th Cir. 2018)(citing *Morgan v. SVT, LLC*, 724 F.3d 990, 995 (7th Cir. 2013)). The legal standard used to evaluate a discrimination claim "is simply

whether the evidence," considered as a whole, "would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).

Courts have recognized that this burden of proof in Title VII cases is especially difficult to meet when it comes to academic tenure. *Haynes v. Indiana University*, 902 F.3d 724, 734. Courts have long recognized the "nuanced nature" of tenure decisions and [their] corresponding reticence to "second-guess the expert decisions of faculty committees." Id. (Citing *Sun v. Bd. of Trs. of Univ. of Ill.*, 473 F.3d 799, 815 (7th Cir. 2007)). Scholars, not courts, "are in the best position to make the highly subjective judgments related with the review of scholarship and university service." *Farrell v. Butler Univ.*, 421 F.3d 609, 616 (7th Cir. 2005). Accordingly, courts closely scrutinize discrimination claims in this context to be sure the dispute is not simply one of academic disagreement with the underlying decision to deny tenure. *Haynes*, 902 F.3d at 734 (7th Cir. 2018).

The structure of the tenure process stands as an additional obstacle to a successful claim. *Haynes*, 902 F.3d at 734. Because a plaintiff must demonstrate that his race precipitated an "adverse employment action," *Ortiz*, 834 F.3d at 765 (emphasis added), the inquiry centers on the motivations of the ultimate decision-makers. Haynes, 902 F.3d at 734. With tenure this analysis is unusually complex. Several "independent and University-wide committees" conduct "numerous layers of review," and "the causal connection between any possible discriminatory motive of a subordinate participant ... and the ultimate tenure decision is weak or nonexistent." Haynes, 902 F.3d 734 (citing *Adelman-Reyes v. Saint Xavier Univ.*, 500 F.3d 662, 667 (7th Cir. 2007) (quotation marks omitted)). Thus a plaintiff needs compelling evidence that "clear discrimination" pervasively infected the final tenure decision. *Farrell*, 421 F.3d at 609.

The analysis used by the Seventh Circuit in the *Haynes* case is particularly instructive due to the similarity of the factual allegations by the plaintiff in that case to Plaintiff in the instant case. In Haynes, a black male, was denied tenure. He filed several claims against the university, including race discrimination. The Seventh Circuit, in its analysis on the merits of the case, held as follows:

> This case is not a close one under these standards. In fact, we need not rely much on the finer points of academic tenure and its intersection with antidiscrimination law. Haynes's claim fails for the simple reason that he lacks any evidence to suggest that the University denied tenure because he is black.

> The bulk of Haynes's case focuses on his allegations of chicanery during the University's review of his tenure application. For example, he contends that Brush, the department chair, recommended critical and unqualified external reviewers, wrote the report of his committee's findings in a way that would make support for his candidacy look more tepid, and expressed animosity toward him both in person and in correspondence with other faculty members. He also alleges that Glazewski and Gonzalez, who took the lead when the process moved to the School of Education, engaged in similar behavior. Even if we credit these assertions, there remains a simple and fatal flaw. **Haynes has no evidence that any of these people sought to sabotage him because of his race. He must base the core of his claim on something other than bald speculation**. See *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993) (holding that the employee bears the burden to prove that "discrimination was the real reason" behind an adverse action) **(emphasis added)**.

> Haynes next urges us to consider certain indicia of his performance as an assistant professor: he once obtained a research grant, won a teaching award, and earned an "exemplary" performance review several months before tenure was denied. To Haynes's mind these accolades show that the University must have acted out of racial animus because he was otherwise qualified for tenure. This argument is twice unsound. Again Haynes assumes racism with no proof. And as important, Haynes's argument rests on a premise we cannot entertain. To prove pretext he must first prove that he was worthy of tenure. But as we've just explained, we do not sit as an academic review board and "second-guess the expert decisions of faculty committees." *Sun*, 473 F.3d at 815. Haynes must do more than ask us to question the academic judgment of the faculty members who decided he was unqualified for tenure.

14

*Haynes v. Ind. Univ.*, 902 F.3d at 734-735

The same "second-guessing" that the Seventh Circuit declined to do in the Haynes case is the same "second-guessing" of expert decisions that Plaintiff asks this Court to do here. Plaintiff is asking this Court not only to review the UIUC's complex tenure process, but then also substitute its judgment regarding Plaintiff's performance as an assistant professor and her dossier for the judgment of the expert decisions of the multiple faculty members and outside reviewers who were involved in the tenure review process.

However, it is not necessary for the Court to do that at this stage, because Plaintiff has failed to state a prima facie case of discrimination. Plaintiff claims that her race, sex, and her conflict with the other employee were the reasons she was denied tenure. In support of her claims of race and sex discrimination, Plaintiff claims that UIUC, through its Promotion and Tenure Committee ("P&T Committee") "discriminated against Plaintiff by providing inaccurate direction regarding the tenure process and failing to participate in objective evaluation of Plaintiff's merit." (Complaint, ¶133).

In fact, Plaintiff' work and performance went through the same review process through which all other candidates for tenure go. (Complaint, ¶¶86-109, compare with ¶¶110-132). The tenure process involves review by both those connected with UIUC, and outside reviewers. (Complaint, ¶¶94-96). Throughout her time at UIUC, Plaintiff was advised on her progress towards being awarded tenure. (Complaint, ¶¶113, 116, 118, and 120-121). Plaintiff was advised of items that were lacking in her dossier and items that she would need to address in order to be successful in being awarded tenure. *Id*. UIUC gave these suggestions and recommendations to Plaintiff well in advance of her review so that she had a chance to address them.

In reality, the crux of Plaintiff' complaints is that the original individuals who were advising her and who were on the P&T Committee left the University, and Plaintiff felt that the new members did not view Plaintiff as favorably. The allegations of Plaintiff's Complaint indicates that her work went through the same process as other tenure candidates – however, Plaintiff alleges that her work was judged more harshly. However, this had nothing to do with Plaintiff's race, color or sex.

Finally, the dean of the College of Media personally reviewed the decision to deny Plaintiff' tenure in order to ensure that the process was fair, and that the conclusion reached by the P&T Committee was reasonable. (Complaint, ¶¶166-167). She concluded that the procedures were fair and proper, and the decision to decline tenure was consistent with the materials reviewed and based on reasonable conclusions.

Plaintiff argues in her Complaint about weight that should have been given to certain creative works and publications she had, and that she was subject to standards simply because she was a black female. Plaintiff does not allege a similarly-situated comparator who is treated more favorably than her. First, she alleges that Mr. Ledford was permitted to proceed under former guidelines that she was not able to proceed under. (Complaint, ¶¶147-151). However, Plaintiff acknowledges that Mr. Ledford's tenure application was made and granted before her own, and that her tenure clock started two years after his. (Complaint, ¶¶147, 150). Plaintiff complains that she was not allowed to proceed under former guidelines, but Mr. Ledford was; however, she admits in her Complaint that Mr. Ledford's tenure was granted the very year that the promotion and tenure process was changed. (Complaint, ¶149). The fact that promotion and tenure guidelines were changed, does not mean that Plaintiff was discriminated against; and more

importantly, it does mean that Mr. Ledford is not a similarly-situated co-worker. Similarly, Plaintiff attempts to find a similarly-situated comparator in Mr. Ben Holden. However, Mr. Ben Holden, like Plaintiff, is African-American. (Complaint, ¶152). Accordingly, he, too, is not an appropriate comparator.

Plaintiff also makes claims that the University gave her advice regarding her dossier that was not correct and that impacted the review by the external reviewers. Even as recently as last year, the Seventh Circuit reiterated its extreme reluctance to review decisions of this nature:

> "According to Seye, Paydar's reasons 'deviate considerably' from the University's tenure guidelines and 'conflict with documents in the record.' This effectively asks us to re-evaluate the substance of his application and dossier. Tenure decisions, however, 'necessarily rely on subjective judgments about academic potential,' and involve assessments of promise as well as qualification."

*Seye v. Trustees of Indiana University*, 2020 U.S. App. LEXIS 38189 *7 (7th Cir. 2020) (citing *Vanasco v. National-Louis Univ.*, 137 F.3d 962, 968 (7th Cir. 1998).

In sum, there is no non-conclusory allegations that the decision to deny tenure for Plaintiff was based on her race, color or sex. The decision was based on a rigorous process, and included evaluations from individuals not connected with the University. The University followed its process, and ultimately made a decision based on multiple factors, including its subjective judgments about Plaintiff' academic potential. Plaintiff has not offered any factual allegations that the decision to deny tenure was based on race or sex. She only offers "bald speculation."

## VI. Count V should be dismissed as Plaintiff has failed to state a claim of retaliation.

Plaintiff has alleged a Title VII retaliation claim (Count V). To succeed on a retaliation claim, Plaintiff must prove: [1] she engaged in a protected activity, [2] she performed her job duties according to her employer's legitimate expectations, [3] she suffered an adverse employment

17

action, and [4] she was treated less favorably than similarly-situated employees who did not engage in a protected activity. *Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018).

Plaintiff alleges UIUC retaliated against her by providing "negative references to Plaintiff's perspective employers." (Complaint, Count V, ¶232). Plaintiff's allegations concerning negative references are [1] pure speculation, and [2] are not adverse employment actions. According to the Complaint, Mr. Ledford served as a reference for Plaintiff's application to the University of Kentucky. (Complaint, ¶194). Plaintiff alleges that Mr. Ledford was asked by an interviewer from the University of Kentucky about the "harassment that Plaintiff experienced as a result of Defendant Erdey's conduct," and why she "never appealed her tenure denial." (Complaint, ¶194). The allegations that follow demonstrate the speculative nature of her retaliation claim. Plaintiff states that she "<u>concluded</u> that UIUC employees <u>must have informed</u> her references of her situation involving Defendant Erdey." (Complaint, ¶196). (Emphasis added). Notably, Plaintiff does not allege that UIUC told the University of Kentucky about her situation involving Mr. Erdey. Plaintiff alleges her references told the University of Kentucky and speculates that her references must have learned the information from UIUC. Plaintiff's allegations acknowledge the speculative nature of her claim, and therefore, should be dismissed.

Furthermore, even if UIUC employees informed Plaintiff's references about the harassment that she experienced as a result of Mr. Erdey's conduct, it is of no consequence. There is nothing negative to Plaintiff about this information, certainly nothing that rises to the level of an adverse employment action. Plaintiff does not allege that UIUC provided a negative reference by informing her references of her tenure denial or appeal thereto. (See Complaint, ¶¶194-196). Even if it had, again that is not a negative reference.

Finally, Plaintiff claims that an administrator of the College of Media ordered employees not to speak with assistant professors who had been denied tenure. (See Complaint, Count V, ¶232). "An adverse employment action might occur when an employer orders its employees to shun the plaintiff, provided that this activity causes material harm to the plaintiff." *Haugerud v. Amery Sch. Dist.,* 259 F.3d 678, 692 (7th Cir. 2001)(citing *Parkins v. Civil Constructors,* 163 F.3d 1027, 1029 (7th Cir. 1998)). Here, Plaintiff's allegations fail to state a claim as they do not allege anyone from UIUC ordered its employees to shun the Plaintiff. Notably, the alleged order did not single her out, but rather was directed to any assistant professors who had been denied tenure. Moreover, Plaintiff does not allege she was harmed in any way. Plaintiff does not specify who this administrator is that allegedly gave an order, when this order was given (2010 before Plaintiff was even on campus, or in 2018 after her tenure was denied?), and whether it was followed. In fact, the allegations of her Complaint show that the alleged order was not followed because her trusted friends continued to speak with her and other colleagues spoke with her, albeit less. (Complaint, ¶175).

Plaintiff does not sufficiently allege that she suffered an adverse action, or that there is any causal connection between her alleged reports of harassment and discrimination or attempt to seek recourse for her tenure denial and purported negative references or orders to not speak with assistant professors who have been denied tenure. Accordingly, Count V of the Plaintiff's Complaint alleging retaliation must be dismissed.

**VII.  Plaintiff's claim Under 740 ILCS 23/5 (Count VI) should be dismissed because it is time-barred and has failed to state a claim of discrimination.**

Count VI of Plaintiff's Complaint purports to bring a claim under 740 ILCS 23/5, which allows an aggrieved party to bring a claim in court against a unit of State, county or local

government for alleged discrimination. 740 ILCS 23/5(a-b). There is no requirement that a party file a charge with EEOC before bringing this lawsuit. However, that lawsuit must be brought "not later than 2 years after the violation of subsection (a)." 740 ILCS 23/5(b). Plaintiff was informed of UIUC's decision to deny her tenure in October 2018. Plaintiff appealed that decision, and was informed of the denial of her appeals in December 2018. (Complaint, ¶168). Thus, Plaintiff had until December 2020 to bring her lawsuit against UIUC. However, she waited until June 14, 2021 to file this action. This is well beyond the two-year statute of limitations under this statute.

Plaintiff may attempt to make the same argument that she makes with respect to her Title VII claims – that the EEOC advised her to wait until she was terminated. However, this argument is not persuasive for two reasons. First, under this Illinois statute, it is not required that a party file a charge with the EEOC before bringing a lawsuit. A party may proceed directly to court under this statute. So, any alleged reliance on Plaintiff's argument that she was going through the EEOC process is inapplicable here.

Second, the adverse employment action of which Plaintiff complains occurred, at the latest, in December 2018. By that point, Plaintiff had been informed of UIUC's decision to deny her tenure, and that she would be issued a terminal contract. The harm of which Plaintiff complains occurred in December 2018, not at the end of her 2019-2020 contract. For an additional analysis of this issue and case law in support, please see Defendants' argument in Section II above. Because Plaintiff failed to file a lawsuit within the two year statute of limitations under 740 ILCS 23/5, Count VI should be dismissed.

Finally, Plaintiff fails to state a claim. The Illinois Civil Rights Act is patterned after Title VI of the Civil Rights Act. Accordingly, courts can look to federal civil rights statutes for guidance on

the interpretation of the Act. *Cary v. Ne. Ill. Reg'l Commuter R.R. Corp.,* 2020 U.S. Dist. LEXIS 49102 at *10 (N.D. Ill. Mar. 22. 2020). "To state a claim for disparate treatment, a plaintiff must allege that an employer 'took job-related action against him which was motivated by intentional discrimination.'" *Id.* (quoting *Alamo v. Bliss,* 864 F.3d 541, 552 (7th Cir. 2017)(interpreting Title VII). Both Counts IV and VI allege a failure to promote. As set forth above in Section V, Plaintiff's Title VII failure to promote claim fails. Accordingly, so too does Count VI, her Illinois Civil Rights Act claim.

**VIII.    Count VII should be dismissed because Plaintiff has failed to state a claim for intentional infliction of emotional distress.**

Count VII purports to be an intentional infliction of emotional distress claim against Defendant Erdey. However, the allegations of extreme and outrageous conduct do not concern Erdey, and appear to be directed at some other individual or entity. Plaintiff states that Erdey directed "Plaintiff to repeatedly interact with Defendant Erdey who subjected her to harassment and discrimination." (Complaint, Count VII, ¶237). Plaintiff goes on to allege that Defendant Erdey failed "to investigate or mitigate the harassment and discrimination," that he subjected her to. (Complaint, Count VII, ¶237). Finally, Plaintiff alleges that Defendant Erdey retaliated against Plaintiff for reporting the harassment and discrimination. (Complaint, Count VII, ¶237). In sum, Plaintiff alleges that Defendant Erdey engaged in extreme and outrageous conduct by directing Plaintiff to interact with him, failing to investigate Plaintiff's allegations against him, and retaliating against her for making such reports. Defendants are confused as to what Plaintiff is alleging as these allegations appear directed towards UIUC and not Defendant Erdey as an individual defendant. Accordingly, Plaintiff fails to state a claim against Defendant Erdey.

Even assuming the allegations were properly made against Defendant Erdey, in order to recover for intentional infliction of emotional distress (IIED), a plaintiff must allege "(1) defendant['s] conduct was extreme and outrageous; (2) defendant[] either intended to inflict severe emotional distress or knew that there was a high probability that their conduct would do so; and (3) defendant[] conduct actually caused severe emotional distress." *Lifton v. Bd. of Educ. of City of Chicago*, 416 F.3d 571, 579 (7th Cir. 2005) (quoting *Thomas v. Fuerst*, 803 N.E.2d 619, 625, 345 Ill. App. 3d 929, 281 Ill. Dec. 215 (2004)).

To be considered extreme and outrageous, conduct "must be so extreme as to go beyond all possible bounds of decency, and to be regarded as intolerable in a civilized community." *Hukic v. Aurora Loan Servs.*, 588 F.3d 420, 438 (7th Cir. 2009) (quoting *Kolegas v. Heftel Broad. Corp.*, 154 Ill. 2d 1, 21, 607 N.E.2d 201, 180 Ill. Dec. 307 (1992)). Courts are reluctant to allow IIED claims to proceed in the employer/employee context, "the concern being that doing so would authorize IIED claims by most workers who are terminated or even disciplined." *Reed v. Colo. Tech. Univ.*, No. 15 C 3368, 2016 U.S. Dist. LEXIS 33522, 2016 WL 1019830, at *5 (N.D. Ill. Mar. 15, 2016) (citing *Honaker v. Smith*, 256 F.3d 477, 491 (7th Cir. 2001)). But the Court may find an IIED claim actionable in the employer/employee context "where the employer clearly abuses the power it holds over an employee in a manner far more severe than the typical disagreements or job-related stress caused by the average work environment." *Honaker*, 256 F.3d at 491.

As described above in relation to Plaintiff's claims of a hostile work environment, the conduct Plaintiff attributes to Mr. Erdey falls far short of being "so extreme as to go beyond all possible bounds of decency." Assuming Plaintiff's claims to be true for the purposes of this Motion, Mr. Erdey's conduct, at worst, can be described as rude, insensitive, or boorish. It is not

"extreme" or "intolerable in a civilized community." While calling someone "stupid," "angry," or criticizing her teaching style might be considered rude, or insensitive, it is clearly not the kind of extreme behavior that would support a claim of IIED. As such, Plaintiff has failed to state a claim of IIED, and Count VII should be dismissed.

**IX.    Count VIII should be dismissed because Plaintiff has failed to plead an essential element of negligent infliction of emotional distress.**

As with Count VII, Count VIII, negligent infliction of emotional distress, purports to be against Defendant Erdey. However, like Count VII, the allegations of Count VIII are not directed against him. In fact, the allegations specifically refer to "Defendant Board of Trustees" and two individuals that are not Defendants in this lawsuit, "Defendants Benson and Ms. Sulkin." (See Complaint, Count VIII, ¶¶241, 242, 243). Defendant Erdey's name does not appear in any of the allegations concerning negligent infliction of emotional distress. Moreover, Plaintiff's claims fail to state a clam upon which relief can be granted.

The tort of negligent infliction of emotional distress consists of the traditional negligence elements, but adds an additional requirement depending upon how the court characterizes the victim. *Kapoulas v. Williams Ins. Agency*, 11 F.3d 1380, 1382 (7th Cir. 1993). Victims may be emotionally scarred as direct victims, they may be scarred as bystanders, or they may be a mix of both. *Id*.

For direct victims, traditionally, the impact rule would apply. *Allen v. Otis Elevator Co.*, 206 Ill. App. 3d 173, 150 Ill. Dec. 699, 563 N.E.2d 826 (Ill. App. Ct. 1990) (holding that the impact rule applies to a direct victim of a negligent act); *Rickey v. Chicago Transit Auth.*, 98 Ill. 2d 546, 75 Ill. Dec. 211, 214, 457 N.E.2d 1 (Ill. 1983); see *Braun v. Craven*, 175 Ill. 401, 51 N.E. 657 (Ill. 1898); That is, a plaintiff must plead that his emotional distress resulted from a contemporaneous impact or

injury. *Hirn v. Teledyne Continental Motors, No*. 1994, LEXIS 17291 at *7-8, 1994 WL 685071, at *2 (N.D. Ill. Dec. 7, 1994).

The Seventh Circuit, interpreting the *Corgan* case, stated that the impact rule still applies in direct victim claims. *Kapoulas*, 11 F.3d at 1382; see also *Buckley v. Jones Truck Lines*, 778 F. Supp. 449, 451 (N.D. Ill. 1991). Three years after the *Corgan* decision in 1994, an Illinois appellate court held that either an injury or impact must have occurred for a plaintiff to recover under the tort of negligent infliction of emotional distress. *Jarka v. Yellow Cab Co*., 202 Ill. Dec. 360, 365, 637 N.E.2d 1096 (Ill. App. Ct. 1994). Therefore, for Plaintiff's negligent infliction of emotional distress claim to prevail, she must have alleged some impact or injury which sparked her alleged emotional disturbance. See *Hirn*, 1994 WL 685071, at *2, 1994 LEXIS 17291 (holding that the failure to plead an impact or injury is fatal to the count); *see also Schweihs v. Chase Home Fin., LLC,* 2016 IL 120041, ¶44 (2016)("the pleading requirements for a direct victim's recovery for negligently inflicted emotional distress include an allegation of a contemporaneous physical injury or impact.") Plaintiff merely alleges that she "suffered severe physical and emotional damage due to Defendant Board of Trustees' negligent conduct." (Complaint, Count VIII, ¶243). This is insufficient. She has not alleged contemporaneous physical injury or impact. Because Plaintiff, as the purported direct victim, has failed to plead any kind of physical impact or injury, however slight, her claims of negligent infliction of emotional distress must be dismissed.

## X.    Conclusion

While her Complaint has been styled as multiple claims under various statutes, Plaintiff's Complaint is based on her claims that she was improperly denied tenure, and suffered a hostile work environment based on the actions of her colleague, Mr. Erdey. However, as is stated above,

Plaintiff cannot tie the decision to deny her tenure or the conduct of Mr. Erdey to her race or sex. Plaintiff's real issue is that she believes UIUC imposed an unfair standard when evaluation her work in making its tenure decision. However, she cannot point to any specific facts, other than her own speculation and conclusory statements, that the decision to deny her tenure was based on her race or sex. Likewise, with respect to Mr. Erdey's alleged conduct, Plaintiff has failed to allege that any of his comments were based on her race or sex, other than her own suggestion that his comments were rooted in racist and sexist stereotypes about black females. Even when Plaintiff states that she received "racially-charged texts," she conveniently offers to include what the text actually said – only her own conclusion that it was "racially-charged." In short, Plaintiff has failed to plead the essentially elements of claims of discrimination (either race or sex) and of a hostile work environment. The Court should ignore Plaintiff's efforts to label all of her disagreements as racial harassment.

Additionally, Plaintiff's Title VII claims and her claims under 740 ILCS 23/5 are time-barred. However, even if this Court were to determine that her claims were timely filed, there are still no facts alleged by Plaintiff that would state a claim upon which relief could be based.

Finally, Plaintiff's claims for intentional and negligent infliction of emotional distress both failed to allege facts that would be sufficient to state a claim upon which relief can be based.

In short, Plaintiff has failed to plead any facts from which the Court could plausibly infer that discovery would reveal any evidence that Plaintiff suffered a hostile work environment based on race or that she was discriminated against because of her race. Therefore, Defendants, the Board of Trustees of the University of Illinois and Kenneth Erdey, individually respectfully request this Court grant its Motion to Dismiss Plaintiff's Complaint and any other relief it deems just.

2:21-cv-02136-CSB-EIL   # 10   Page 26 of 27

Respectfully submitted,

THE BOARD OF TRUSTEES OF THE UNIVERSITY OF
ILLINOIS and KENNETH ERDEY, Defendants

BY: /s/ Brian M. Smith
Brian M. Smith/ARDC #: 6293822
Katie H. Anderson/ARDC #: 6295322
HEYL, ROYSTER, VOELKER & ALLEN, P.C.
301 North Neil Street, Suite 505
Champaign, IL 61820
Telephone 217.344.0060
Email: bsmith@heylroyster.com
Email: kanderson@heylroyster.com

## TYPE-VOLUME CERTIFICATION

Pursuant to Local Rule 7.1(B), the undersigned counsel attests that the body of this Motion and Memorandum of Law does *exceed* 7,000 words in length. According to counsel's Word processor, this document consists of 7,842 words, starting from the "Introduction" and ending with the "Conclusion" section. Counsel has filed a separate Motion for Leave to File Excess Pages.

s/ Brian M. Smith
Brian M. Smith, IL ARDC #: 6293822
HEYL, ROYSTER, VOELKER & ALLEN
Suite 505, 301 N. Neil Street
Champaign, IL 61820
Phone: 217.344.0060
Email:  bsmith@heylroyster.com

**CERTIFICATE OF SERVICE**

I hereby certify that on August 24, 2021, I electronically filed the foregoing MOTION TO DISMISS PURSUANT TO 12(b)(6) AND MEMORANDUM OF LAW IN SUPPORT THEREOF with the Clerk of the Court using the CM/ECF system, which will send notification to:

Mr. Thomas G. Gardiner
Gardiner Koch Weisberg & Wrona
53 W. Jackson Blvd., Suite 950
Chicago, IL 60604
Email: tgardiner@gkwwlaw.com

I also hereby certify that I mailed by United States Postal Service the foregoing to the following non-CM/ECF participant: None.

s/ Brian M. Smith _____
Heyl, Royster, Voelker & Allen

40101979_1